IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ENTERPRISE RENT-A-CAR | ) | MDL No. 2056 |
| WAGE & HOUR EMPLOYMENT | ) | |
| PRACTICES LITIGATION | ) | Misc. No. 09-210 |
| | ) | |
| | ) | Civil No. 07-1687 |
| NICKOLAS HICKTON, *et. al.*, | ) | Civil No. 09-0815 |
| | ) | Civil No. 09-0816 |
| Plaintiffs, | ) | Civil No. 09-0824 |
| | ) | Civil No. 09-0832 |
| v. | ) | Civil No. 09-0833 |
| | ) | Civil No. 09-1188 |
| ENTERPRISE RENT-A-CAR | ) | Civil No. 09-1321 |
| COMPANY, *et. al.*, | ) | Civil No. 10-1003 |
| | ) | Civil No. 10-1189 |
| Defendants. | ) | Civil No. 10-1456 |
| | ) | Civil No. 11-0071 |
| | ) | Civil No. 11-0333 |
| | ) | Civil No. 11-1024 |
| | ) | Civil No. 12-0659 |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Bromfield v. Enterprise Rent-A-Car | ) | |
| Company, Civil No. 09-1188 | ) | |
| | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

*I. Introduction*

This opinion concerns sample plaintiff Nils Hagstrom ("Hagstrom"). Pending before the

court are eight motions for summary judgment filed by the relevant operating subsidiaries

(collectively "defendants") of former defendant Enterprise Rent-a-Car Company ("ERAC")

against sample plaintiffs[1] selected from the cases consolidated in this multidistrict litigation

---
[1] The following individuals were selected as sample plaintiffs: Robert Bajkowski; Joseph Biski; Wayman F. Graham II; Kevin C. Hagler; Nils Hagstrom ("Hagstrom"); Nickolas C. Hickton; Melinda McQuaig (formerly, Melinda Herrin); and Brandon Singleton.

("MDL"). The consolidated cases involve allegations that defendants violated the compensation requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay plaintiffs overtime compensation. Plaintiffs are or were assistant managers employed by one of the defendants.

This memorandum opinion addresses the motion for summary judgment filed by defendant ELRAC, LLC ("ERAC-New York"), a subsidiary of ERAC, against Hagstrom. (ECF No. 249.)[2] ERAC-New York argues that Hagstrom qualified for the executive, administrative and combination exemptions from the compensation requirements of the FLSA. Hagstrom responds that summary judgment would be improper at this stage because there are genuine disputes of material facts concerning whether the "narrowly construed" FLSA exemptions are applicable. ERAC-New York argues that no dispute is genuine because plaintiffs submitted declarations that violated the "sham affidavit" doctrine in an attempt to fabricate disputes of fact. In response, Hagstrom argues that the sham affidavit doctrine is not applicable and that certain of the declarations filed in support of the motion for summary judgment were submitted in violation of Federal Rule of Civil Procedure 26. Each of those arguments will be addressed.

After an extensive review of the parties' submissions, the hearing transcript of the oral argument and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and the narrowness of the FLSA exemptions, ERAC-New York failed to satisfy its burden of proving as a matter of law that Hagstrom was properly classified as exempt. The motion for summary judgment filed by ERAC-New York against sample plaintiff Hagstrom will be DENIED.

---

[2] Unless otherwise indicated, all references in this opinion to CM/ECF electronic document filing numbers are made with reference to the MDL master docket, filed under the miscellaneous case number 2:09-mc-210.

### II. Factual Background

On September 13, 2006, ERAC-New York hired Hagstrom as a management trainee. (Hagstrom JCS I (ECF No. 433) ¶ 1.)  On May 28, 2007, Hagstrom was promoted to management assistant.  (Id. ¶ 2.)  He was promoted to assistant manager shortly thereafter on June 18, 2007.  (Id. ¶ 3.)  Hagstrom remained in that position for approximately one year before resigning from ERAC-New York on June 25, 2008.  (Id. ¶ 4.)  This opinion concerns the period of time during which Hagstrom was an assistant manager.  During his entire tenure as an assistant manager, Hagstrom worked at a daily rental branch located at 221 Thompson Street in the borough of Manhattan, New York City, New York (the "Thompson branch").  (Id. ¶ 5.)  The Thompson branch included a satellite branch at 56 Fulton Street in Manhattan (the "Fulton branch").[3]  (Id. ¶ 6.)

Generally, according to Hagstrom's area manager, John Crivaro ("Crivaro"), the Thompson branch was staffed with an assistant manager and approximately four hourly employees, with additional hourly employees during busy periods.  (Crivaro Decl. (ECF No. 274-3) ¶ 10.)  Crivaro stated in his declaration that the Fulton branch was typically staffed by an assistant manager, as well as approximately two or three hourly employees.  (Id.)  Hagstrom testified that the Fulton branch was usually staffed by an assistant manager or branch manager, as well as at least one car prep and usually a management trainee.[4]  (Hagstrom Dep. (ECF No.

---

[3] Hagstrom testified that he only infrequently worked at the Fulton branch.  (Hagstrom Dep. (ECF No. 274-1) at 17.) The Fulton branch only became part of the Thompson branch toward the end of Hagstrom's employment, and a different assistant manager was assigned to work there more often than Hagstrom.  (Id. at 18.)

[4] Like Hagstrom, unless an employee was a nonexempt car prep or some other manual laborer, most employees at ERAC-New York were hired as management trainees, from which they could be promoted to management assistants, then assistant managers, then branch managers and finally regional managers.  (Hagstrom Dep. (ECF No. 274-1) at 17.)  The record for this MDL reflects that the career path extended beyond regional managers, who typically oversaw operations at multiple branches or at larger, airport branches, but none of those positions are relevant to this opinion.  Employees were classified as nonexempt under the FLSA and received overtime

274-1) at 17.)  Hagstrom's deposition testimony indicates that the Fulton and Thompson branches were often understaffed—employees frequently failed to come in when scheduled, and the branches were often staffed by two or fewer nonexempt employees while Hagstrom was working.  (Id. at 18, 57.)  Hagstrom testified that he worked between forty-eight and sixty hours per week, and estimated that he averaged fifty-two or fifty-three hours of work per week.  (Id. at 49.)

Although Hagstrom had three different branch managers during his tenure as assistant manager, "the job function was always the same" under each of his supervisors.  (Id. at 28.)  He testified that his branch manager was "always" at the branch[5] and "it seemed like she never left." (Id.)  His second branch manager "was always there early," but it is unclear from his testimony what time each day she left the branch.  (Id.)  Hagstrom's third branch manager began to work at the branch only briefly before Hagstrom left ERAC-New York, and Hagstrom had no recollection of the constancy or lack thereof of his presence at the branch.  (Id.)  Hagstrom recalled seeing Crivaro, his area manager, at least once per week in the branch, and occasionally more often.  (Id. at 9.)  Even when the branch manager and area manager were away from the branch, Hagstrom frequently called them for guidance when presented with a difficult problem that he felt unequipped to handle.  (Id. at 66.)  For example, he might call for guidance if an employee damaged a car or if a customer presented him with a difficult decision about whether and how to rent a vehicle.  (Id.)

During two-to-three weeks of Hagstrom's year as an assistant manager, there was no branch manager at the Thompson or Fulton branches.  (Id. at 65.)  Hagstrom testified that his job

---

compensation as management trainees and management assistants, but were paid a salary without overtime compensation upon promotion to assistant manager.  (Hagstrom Dep. (ECF No. 274-1) at 33.)
[5] References to "the branch," unless otherwise noted, are references to the Thompson branch, at which Hagstrom primarily was employed.

responsibilities during that time did not change, and that Crivaro was responsible for managing the branches during the interim.  (Id. at 9.)  For example, with respect to scheduling, Hagstrom did not recall assuming any additional scheduling responsibilities during this period, with the possible exception of posting a recycled schedule put together by his former branch manager. (Id. at 45.)  He could not recall whether Crivaro or he would have posted or announced the schedule during that time.  (Id.)

When Hagstrom was promoted to assistant manager, he participated in training on a variety of management-related topics.  (Hagstrom JCS I (ECF No. 433) ¶ 9.)  For example, Hagstrom attended a three-day assistant manager retreat, which included topics such as "Leadership," "Value Proposition Marketing," and "Counter Manager Training."  (Id. ¶ 10.) Hagstrom felt the training prepared him for sales, but asked for more training about management because he did not know how the branch was actually run in the back office, and felt his training insufficiently addressed personnel management issues.  (Hagstrom Dep. (ECF No. 274-1) at 29-31.)

During his deposition, Hagstrom testified that he did not run the branch; rather, he "helped" the branch manager run the branch.  (Id. at 41.)  He testified that the branch manager and area manager were in charge of the overall operations of the branch.  (Id. at 65.)  The branch manager decided how to run the branch—"it's run how they wanted to run it"—and Hagstrom was "told what to do and [went] from there."  (Id. at 57.)  Hagstrom explained that he helped manage the branch and, although a resumé he submitted with job applications following his time at ERAC-New York reflected that he "managed fifteen employees within two rental offices,"[6] he

---

[6] Hagstrom's resumé also indicates that he "[t]rained and developed employees in sales, service, marketing and management skills[,] [i]ncreased Fleet [*sic*] size by 10% in first six months as assistant manager though [*sic*]

testified during his deposition that he was not responsible for managing anyone.  (Id. at 8.)  He explained that his resumé included a degree of puffery "[b]ecause [he] was trying to get another job."  (Id. at 5.)

Contrary to Hagstrom's deposition testimony is the declaration of Crivaro, who was area manager during Hagstrom's entire tenure as an assistant manager, and who still holds that position at ERAC-New York.  (Crivaro Decl. (ECF No. 274-3) ¶¶ 2, 3.)  According to Crivaro, Hagstrom's primary function was the management of the branch, its employees and its operations.  (Id. ¶ 4.)  Crivaro testified that the majority of Hagstrom's time on a daily basis was spent on managerial tasks in customer service, operations, human resources, sales, marketing, and fleet management and maintenance—responsibilities which he shared with his branch manager.  (Id.)

In September 2007, one year after Hagstrom began working at ERAC-New York and three months after his promotion to assistant manager, Hagstrom's branch manager reviewed his performance.  (Hagstrom Review (ECF No. 274- 8).)  Hagstrom completed a portion of his employee performance evaluation where he indicated the percentage of time each week spent on various "management duties":

> (A) MANAGEMENT OF CUSTOMER SERVICE . . . 45%[;]
>
> (B) HUMAN RESOURCE MANAGEMENT . . .  5%[;]
>
> (C) SALES AND MARKETING . . . 25%[;]
>
> (D) BRANCH ACCOUNTING . . . 0%[;]
>
> (E) FLEET MANAGEMENT . . . 10%[;]

---

marketing to local body shops, insurance agents and businesses – set up 15 corporate accounts including 1 national account[,] [and] [p]roduced revenues of over $120,000 every month."  (Hagstrom Resume (ECF No. 274-6).)

(F) MANAGEMENT OF BRANCH SAFETY, SECURITY,

MAINTENANCE, AND APPEARANCE . . . 15 %[; and]

(G) OTHER . . . [uncompleted] %[.]

(Id. at 9.)  During his deposition, Hagstrom stated that the percentages were not an accurate

reflection of his actual job duties because he spent a considerable amount of time performing

tasks that were not listed on the performance review.  (Hagstrom Dep. at 42.)  He "didn't think

[the percentage breakdown in the evaluation] was important" at the time he was filling it out.

(Id.)  Hagstrom provided, as examples of other tasks not reflected in his review, that he spent

approximately eight hours per week washing cars and seven-and-a-half hours per week moving

cars.  (Id.)  Hagstrom admitted that he multitasked on occasion by simultaneously washing a car

and directing the work of others, or by keeping an eye on other employees while performing his

own duties.  (Id. at 42-43, 59.)

Hagstrom did not compile the weekly branch schedule—that duty was reserved for the

branch manager.  (Id. at 16-17.)   Positions at the phones, counter, and in the garage were filled

on a rotating basis and, to the extent those positions were assigned to specific employees, the

branch manager was charged with developing a "peak plan" to assign those positions.  (Id. at 56-

57.)   Hagstrom testified that as the assistant manager, he was often assigned to the "counter

quarterback" position, but that position was also filled by management trainees and interns.  (Id.)

The branch manager typically ran the rental counter.  (Id. at 63.)  When Hagstrom was running

the rental counter as the quarterback, contrary to the title, he did not organize and direct the

efforts of other employees because he was usually the only employee working at the counter.

(Id. at 56.)   ERAC-New York encouraged assistant managers and branch managers to write

fewer rental tickets than their nonexempt counterparts, but the assistant managers and branch

managers always wrote the most rental tickets each month.  (<u>Id.</u> at 56.)  The other employees had

often been sent away from the office to pick up cars.  (<u>Id.</u>)   Hagstrom testified he did not take

much of a role in fleet management,[7] and that his responsibilities in maintaining the right rental

cars at the branch were shared with all employees (including a nonexempt employee who had

primary responsibility for ensuring cars received preventative maintenance when necessary).

(<u>Id.</u> at 39, 51.)

Hagstrom had no input into scheduling or when employees were permitted or required to

come into work.  (<u>Id.</u> at 17.)  His only concern with respect to schedules involved situations

when he was interested in changing his own schedule.  (<u>Id.</u>)  Questions about scheduling were

referred to the branch manager, and nonexempt employees were basically responsible for their

own schedules.  (<u>Id.</u>)  If an employee called to say he was not coming in for the day, Hagstrom

would not and could not tell them that they had to come into work:  "Xavier typically just told

you whether he was going to come in or not.  He didn't leave much room for you to tell him

what to do.  . . . I felt like I didn't have much of a choice."  (<u>Id.</u> at 17-18.)

Hagstrom directed other employees to perform certain duties, including picking up

customers, vehicle maintenance and moving vehicles around the branch or to a different branch.

(<u>Id.</u> at 16, 44.)  Any employee at the branch could direct other employees to do those duties as

the need arose.  (<u>Id.</u> at 16.)  The nonexempt employees' job responsibilities were sufficiently

straightforward and consistent that they often did not require substantial direction:  "I would tell

---

[7] Hagstrom's deposition testimony that he "didn't do a whole lot of fleet management" is ambiguous with respect to whether he is testifying about his entire time as an ERAC-New York employee, or only about his time as a management trainee because the question he answered was explicitly directed to the time he was a management trainee. (Hagstrom Dep. (ECF No. 274-1) at 39.)  In light of the summary judgment standard, the court will resolve the ambiguity in Hagstrom's favor.  ERAC-New York admitted that the testimony was relevant to his time as an assistant manager, noting that "Hagstrom claimed he did not have much responsibility for fleet management" without limiting the testimony to his time as a management trainee, but attempting to qualify it on other grounds. (JCS I (ECF No. 433) ¶ 58.)

Louis what to do and what not to do, but he typically came in and did his job without any supervision.  He would -- typically, he would just come to the office and answer the phones."
(Id.)

Although Hagstrom maintained that all employees were permitted to delegate tasks to each other as needs became apparent—"[i]f the car prep asked me to do something, I would do it" (id. at 6)—he had the authority to ignore the requests made by lower-level employees if he felt he had something more important to do.  (Id. at 50.)  Normally, the branch manager, if he or she was present, would resolve any disagreements.  (Id. at 49.)  If Hagstrom, for example, were asked by a car prep to clean a car, but he felt he needed to complete other tasks, the branch manager would determine the best course of action.  (Id.)  Hagstrom's deposition testimony reflects, however, that he had a limited role in delegating tasks because (a) many employees were self-sufficient and performed job functions (such as answering the phones) that required little oversight and management (id. at 16) and (b) many lower-level employees would simply ignore him (id. at 17-18, 20).

Hagstrom did not discipline employees.  (Id. at 65.)  He recalled one instance where an ERAC-New York employee (not affiliated with either of the branches at which Hagstrom worked) became irate when she was dropping off a car at his branch—Hagstrom called the office where the irate employee worked, and the person working the counter at that office suggested that he should send an email to his branch manager and an individual in human resources.  (Id. at 65-66.)  Hagstrom sent the email, but never heard about the incident again.  (Id. at 66.)  Hagstrom testified that another of the branches' employees, not previously mentioned in this opinion, had issues with absenteeism and damaging cars, and implied that the employee was often in trouble with the police.  (Id. at 20.)  Hagstrom did not talk to him about any of these

issues—"I was just happy when he showed up"—but he or one of the management trainees or management assistants would write a report, documenting what happened and who was at fault, if the employee damaged a vehicle.  (Id.)

Hagstrom made efforts to train and motivate his co-workers, both informally by giving suggestions and by participating in formal training programs created by ERAC-New York.  (Id. at 14-15, 20-21, 30, 63.)  For example, he might give tips about salesmanship to a management assistant.  (Id. at 14, 30.)  Most formal training programs required Hagstrom to initial or sign a document that verified an employee had reviewed ERAC-New York policy documents, memorized information such as the branch phone number, or discussed particular policies with his or her branch mentor, among other similar verifications.  (Employee Training Materials (ECF No. 274-14).)  Anyone at the branch could verify that the forms were correctly filled out, including management assistants and management trainees.  (Hagstrom Dep. (ECF No. 274-1) at 15.)  Hagstrom served as branch mentor to at least two employees.  (Employee Training Materials (ECF No. 274-14).)  A new hire shadowed his or her mentor at the branch on his first day.  (Hagstrom Dep. (ECF No. 274-1) at 20.)

Hagstrom did not select, recommend, or interview job candidates, and he did not hire, fire or promote any employees.  (Id. at 18, 19, 40.)  His opinions were not soliciated and he did not discuss job candidates with Crivaro or the human resources employees who together (he believed) made hiring decisions.  (Id.)  He was not in the room when interviews occurred.  (Id.) If he was working that day, he may have been present during an observational portion of the interview (where the candidate observed the branch's operations), but does not recall ever giving any feedback about his impressions of the candidate to the decision makers.  (Id.)  Most branch observations did not occur at the Fulton or Thompson branches.  (Id.)  He testified that he did not

participate in "other personnel decisions regarding employees including promotions, vehicles and transfers." (Id. at 40.)  Hagstrom did not advise Crivaro and Crivaro did not ask him if an employee was ready for a promotion.  (Id. at 51.)  He would, however, have informal conversations with Crivaro about various employees' performance of their job responsibilities, but never in the context of a promotional decision.  (Id. at 52.)  Hagstrom did not believe his opinion was given any weight in promotional decisions because he never evaluated employees outside the sales context and because no lower-level employees were promoted during the time he was working at ERAC-New York. (Id.)   Like other sample plaintiffs, Hagstrom played a minor role in ERAC-New York's employee evaluation process, filling out portions of the evaluations that gave short suggestions or encouragement to employees.  (Id. at 14, 23-24.)  Hagstrom never conducted an employee review on his own, and he never filled in the employee review form—rather, that form was completed by the branch manager, who then gave it to Hagstrom to fill in a short "assistant manager's comments" section.  (Id. at 23, 40.)

Contrary to Hagstrom's testimony, Crivaro testified that assistant branch managers at ERAC-New York were expected to play a role in hiring, disciplining, training and evaluating employees.  (Crivaro Decl. (ECF No. 274-3) ¶ 13.)  Crivaro testified that he gave considerable weight to the views of Hagstrom in making personnel decisions, including decisions regarding hiring, promotions and terminations.  (Id. ¶ 14.)

Much of Hagstrom's job at ERAC-New York was dictated by pre-established policies from which he did not or was not authorized to deviate.  Hagstrom testified that he occasionally solved problems at ERAC-New York.  (Hagstrom Dep. (ECF No. 274-1) at 12.)  He often referred issues to the branch manager or area manager if he was not capable of addressing them himself.  (Id.)  According to his testimony, he did not participate in human resources

11

management or record keeping for employees.  (Id. at 40.)  He testified: "I didn't develop any logical strategies or strategic alternatives to solving problems.  I mean, everything was pretty much, this is a way to do it."  (Id. at 41.)  He testified he did not keep records and that he "barely knew how to do the receivables and bad dent accidents," and only did those during his last month at ERAC-New York.  (Id.)  He occasionally audited rental tickets at the end of the day— reviewing contracts to make sure they were properly filled out—but "anybody could do it" and "[i]t seemed like [he] never got around to it."  (Id. at 47.)

As a management trainee and management assistant, Hagstrom earned between $12.95 and $13.39 per hour.  (Hagstrom JCS I (ECF No. 433) ¶ 17.)  According to Nancy Pasciuto, the human resources manager for Hagstrom's region of ERAC-New York:

> As an Assistant Branch Manager, [Hagstrom] earned a $30,000 base salary plus more than 2% of branch profits and other incentive compensation.  Mr. Hagstrom's total compensation for the first half of 2007 (during which time he was principally a Management Trainee and Management Assistant, although he was promoted to Assistant Branch Manager near the end of the period) was $16,666.14.  For the second half of 2007, during which time he was an Assistant Branch Manager, Mr. Hagstrom earned $21,947.87, a 31.7% increase.

(Pasciuto Decl (ECF No. 274-2) ¶¶ 2,7.)  Hagstrom testified that assistant managers occasionally made less money over the course of the year than management assistants, depending on the amount of overtime worked by the nonexempt management assistants and the profitability of the branch (which would impact the assistant managers' commission).  (Hagstrom Dep. (ECF No. 274-1) at 33.)

### III. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides in relevant part:

12

**(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

. . .

**(c) Procedures.**

**(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could

13

rationally find in favor of the non-moving party in light of his burden of proof." (citing <u>Celotex</u>

<u>Corp.</u>, 477 U.S. at 322-23; <u>Anderson</u>, 477 U.S. at 248)).

> "[W]hen the moving party has carried its burden under Rule 56(c),
> its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts . . . .  Where the record
> taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no genuine issue for trial."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

<u>Corp.</u>, 475 U.S. 574, 586-87 (1986)).  The court must rely on the substantive law to identify

which facts are material.  <u>Abington Friends Sch.</u>, 480 F.3d at 256 (citing <u>Anderson</u>, 477 U.S. at

248).

In deciding a summary judgment motion, a court must view the facts in the light most

favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts

in favor of the nonmoving party.  <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129,

130 (3d Cir. 2001); <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v.</u>

<u>Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility

determinations at the summary judgment stage.  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>,

142 F.3d 639, 643 n.3 (3d Cir. 1998).


### IV. Discussion

The FLSA is a federal statute, originally enacted in 1938 and designed to combat

substandard labor conditions relating to unfair wages, overlong working hours and a variety of

other perceived evils.  At issue in this motion for summary judgment are some of the myriad

exemptions to the FLSA's overtime requirements.  Specifically, ERAC-New York claims that

Hagstrom was exempt from the FLSA's compensation requirements under one of the following exemptions:  1) executive; 2) administrative; or 3) combination.

As a preliminary matter, before addressing the substantive arguments relating to FLSA exemptions, the court will address the two secondary arguments presented by the parties.  First, ERAC-New York argues that Hagstrom submitted a sham affidavit after his deposition, which this court should disregard in assessing the existence of genuinely disputed material facts.  Second, Hagstrom argues that ERAC-New York failed to disclose the identity of witnesses whose statements were attached to its motion for summary judgment, in violation of Rule 26 of the Federal Rules of Civil Procedure.

### A. Sham Affidavit Doctrine

ERAC-New York asserts that Hagstrom submitted a "sham affidavit."  Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'"  Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 679 (3d Cir. 2006) (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see, e.g., Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-serving affidavits "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969))); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job

responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum

Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008).

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot

maintain a consistent story or is willing to offer a statement solely for the purpose of defeating

summary judgment." Jiminez, 503 F.3d at 253.  Because the trial court is vested with the

inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477

U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary

weight to an affidavit that is clearly offered solely for the purpose of defeating summary

judgment.  Jiminez, 503 F.3d at 253.  The practical underpinning of the sham affidavit doctrine

"is that prior depositions are more reliable than affidavits."  Id.

In Jiminez, the Court of Appeals for the Third Circuit recognized that other courts of

appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that,

whenever a subsequent affidavit contradicts prior deposition testimony, it should be

disregarded." Id. at 254.  The Court of Appeals for the Third Circuit has "adopted a more flexible

approach."  Id.  The court recognized in Jiminez that "not all contradictory affidavits are

necessarily shams."  Id.  Notably, "'[w]hen there is independent evidence in the record to bolster

an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."  Id.

(quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)).  "Such corroborating evidence may

establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the

facts during the previous deposition," and the affiant should have the opportunity to provide a

"satisfactory explanation" for the conflict between the prior deposition and the affidavit.  Id.; see

Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the

present case, the affiant was carefully questioned on the issue, had access to the relevant

16

information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents.  See Lytle v. Capital Area Intermediate Unit, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting Baer, 392 F.3d at 625)).  To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ." Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)).  When allegations in a subsequent affidavit could support statements made in prior deposition testimony, the dueling statements "are more appropriately dealt with on cross-examination than on summary judgment."  Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J. Sept. 28, 2007).

Hagstrom was deposed on October 20, 2009 (Hagstrom Dep. (ECF No. 274-1) at 1), and submitted a supplemental declaration dated February 3, 2011 (Hagstrom Suppl. Decl. (ECF No. 317, Ex. B)).[8]  ERAC-New York points to alleged inconsistencies between the supplemental declaration and Hagstrom's deposition testimony, which will be discussed below in order.

---

[8] Many other sample plaintiffs in this MDL submitted original declarations in opposition to the defendants' motions for summary judgment (which were completed prior to the sample plaintiffs' depositions), but the court could not locate an original declaration by Hagstrom in the record.  To the extent it exists, the court did not rely on it in deciding this motion for summary judgment, and any question about the propriety of relying on it to establish a genuine issue of material fact is therefore moot.  The sham affidavit doctrine applies even when the affidavit

First, ERAC-New York argues that portions of paragraph 5 of Hagstrom's supplemental declaration are inconsistent with his prior deposition testimony.  In paragraph 4, Hagstrom declared, among other things, that he "rarely directed the work of other branch employees" and that when he did it was only in "accordance with the explicit directives" of his branch manager.  (Hagstrom Suppl. Decl. (ECF No. 317, Ex. B) ¶ 5.)  He also declared that "the positions of Assistant Manager, Management Assistant and Management Trainee are largely interchangeable. . . ." (Id.)  ERAC-New York argues that paragraph 4 contradicts Hagstrom's deposition testimony that he directed and managed other employees, and his conclusions about the comparison of the three positions are contradicted by the substance of his prior testimony.  To the extent Hagstrom described during his deposition that he was responsible for delegating minor tasks to other employees as needs arose without reference to his branch manager, the assertion to the contrary in paragraph 5 is flatly contradictory, and the court has disregarded it in considering the motion for summary judgment.  With respect to his opinion comparing the assistant manager, management assistant, and management trainee, that opinion is consistent with his deposition testimony where he provided the same opinion.  For the purposes of the sham affidavit doctrine, it is immaterial whether ERAC-New York disputes Hagstrom's legal opinions, and entirely expected that they would.  In any event, to the extent paragraph 5 expresses Hagstrom's legal opinion—inadmissible opinion evidence—it would not be sufficient to create a genuine dispute of material fact and preclude summary judgment.

Second, ERAC-New York argues that portions of paragraph 6 of Hagstrom's supplemental declaration are inconsistent with his deposition testimony.  ERAC-New York takes

---

predates the deposition because there is "no principle that cabins sham affidavits to a particular sequence."  In re CitX Corp., 448 F.3d at 679-80.  Nonetheless, "cross-examining the affiant in [the] later deposition seems the better way to find the flaws in a bogus affidavit."  Id.

issue with the Hagstrom's opinion that any "so-called 'management'" responsibilities [he] had were insignificant and secondary to [his] primary duty of renting cars." (Id. ¶ 6.) ERAC-New York also challenges the portion of paragraph 6 in which Hagstrom declared that his role in performance evaluations was minor and was limited to the purpose of "documenting, not evaluating, matters [he] had observed about the employee." (Id.) The perceived inconsistency in the testimony is nonfactual, but deals with the contradictory characterization and legal import given the facts by the two parties to the case. Hagstrom testified consistently with the opinions stated above, and ERAC-New York did not identify any extreme facts contradicted by the supplemental declaration. Paragraph 6 is not a sham.

Third, ERAC-New York argues that portions of paragraph 7 of Hagstrom's supplemental declaration are shams. Specifically, ERAC-New York points to Hagstrom's testimony that his schedule largely overlapped with his branch manager's schedule and that he had limited ability to exercise discretion outside of routine matters. (Id. ¶ 7.) ERAC-New York argues this testimony is contradictory because Hagstrom admitted that the Thompson branch was without a branch manager for a short period of time, and because he testified that he was responsible for matters which it considers nonroutine. The court cannot discern any concrete factual discrepancy between the deposition testimony and the declaration. Again, the challenge made by ERAC-New York with respect to paragraph 7 turns on a difference of opinion between the parties about the legal impact of the facts, and on the parties' differing interpretations, presentations and characterizations of the facts. This paragraph is, therefore, not a sham.

Fourth, ERAC-New York challenges Hagstrom's statement in paragraph 9 of his supplemental declaration that the assistant manager at the time Hagstrom was a nonexempt employee "did not direct [Hagstrom's] work, give performance reviews and was not responsible

for [his] overall training." (Id. ¶ 9.)  ERAC-New York argues that this testimony is contradicted

by his deposition testimony that an assistant manager provided him feedback about his job

performance, including stating that Hagstrom should take on a more managerial role and start

acting with more "autonomy."  Again, there is nothing factually contradictory within the

challenged portions of paragraph 9 (when compared with the proffered deposition testimony).

ERAC-New York takes issue with Hagstrom's characterization of the facts, and has not shown

any clear and extreme factual contradictions.  Hagstrom's declarations in paragraph 9 are

therefore not shams.

For the reasons set forth above, and with the exception noted, the court finds the

challenged declaration testimony not flatly contradictory of Hagstrom's deposition testimony.

The declarations are, therefore, not shams.  The court notes that ERAC-New York could not

meet its substantial burden of proof on summary judgment even if the declarations were

disregarded.  Notably, most of the factual information contained in the first section of this

memorandum opinion is derived from sources other than the challenged portions of the

declarations.  Even if the declarations were stricken from the record, there would still be

sufficient genuine disputes of material fact to preclude the court from entering summary

judgment in ERAC-New York's favor.

### B. Rule 26 Disclosures

Plaintiffs assert that statements submitted by defendants in support of the various motions

for summary judgment were made in violation of Federal Rule of Civil Procedure 26.

Defendants argue that they satisfied their Rule 26 obligations because the identities of the

ERAC-New York employees who made declarations ("declarants") were disclosed in the course of depositions.

A party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i).  "A party must make its initial disclosures based on the information then reasonably available to it.  A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E).

Under Federal Rule of Civil Procedure 26(e)(1):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

Rule 37(c) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*." FED. R. CIV. P. 37(c) (emphasis added); see Sherrod v. Lingle, 223 F.3d 605, 612 (7th Cir. 2000).

Because the court is denying this motion for summary judgment, it need not rule on the propriety of the disclosures under Rule 26.   Instead, the discretionary application of Rule 37 sufficiently disposes of the issue, because, presuming defendants did violate Rule 26, the presumed violations would have been harmless.  The imposition of Rule 37 sanctions is within the discretion of this court.  Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156 (3d Cir. 1995).  There are several factors which courts of appeals will consider in evaluating how this court exercises its discretion regarding Rule 37 sanctions.  In re TMI Litig., 193 F.3d 613, 721 (3d Cir. 1999).  This court will use those factors as a guide in applying its discretion. The factors are:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
>
> (4) bad faith or willfulness in failing to comply with the district court's order.

Id. (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)).

Hagstrom was given the opportunity to pursue additional discovery of declarants before the court ruled on the motion for summary judgment and chose not to do so.  (Tr. of Continued Arg. (ECF No. 807) at 117, July 25, 2011.)  The only relief requested by plaintiffs in the briefing on this issue is a "request that the Court disregard the declarations of Defendants' witnesses

provided after the close of the summary judgment discovery period." (Pl.'s Resp. to Defs.'

Suppl. Br. on the Sufficiency of Disclosures (ECF No. 791) at 2.) There is no pending motion

for sanctions. As the court explains *infra* in Section IV.C, genuinely disputed material facts

compel a resolution of this motion in favor of Hagstrom. Thus, to the extent the court relied on

declarants' testimony, the reliance was harmless, as the only relief requested by Hagstrom relates

to the court's determination of this motion, on which Hagstrom ultimately prevailed.

Applying the <u>TMI</u>/<u>Meyers</u> factors, the court finds: first, there is no prejudice to

Hagstrom, as explained above; second, Hagstrom had the opportunity to conduct further

discovery with respect to declarants, but chose not to do so, and could have cured any perceived

prejudice; third, efficient administration of this multidistrict litigation compels the court to

resolve this summary judgment motion without further procedural delay or complicated

wrangling of the record without purpose; and fourth, the court finds no bad faith on the part of

ERAC-New York. For these reasons, and all the reasons listed above, but primarily because the

court is resolving the summary judgment in favor of Hagstrom, there is no need to disregard

declarants' statements, as requested by Hagstrom.

### *C. The FLSA Exemptions*

#### *1.  General Framework*

The FLSA exempts from its overtime provisions "any 'employee in a bona fide

executive, administrative, or professional capacity.'" <u>Soehnle v. Hess Corp.</u>, 399 F. App'x 749,

750 n.1 (3d Cir. 2010) (quoting 29 U.S.C. § 213(a)(1)). Additionally, the FLSA exempts from

its overtime provisions "[e]mployees who perform a combination of exempt duties." 29 C.F.R. §

541.708.

In light of the broad remedial purpose of the FLSA,[9] exemptions are narrowly construed against the employer.  Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir. 2000).  An FLSA exemption is properly characterized as an affirmative defense.  Id. at 180-81, 183.  Thus, "[t]he burden of proof to establish that its employees come within the scope of an overtime exemption is on the employer."  Friedrich v. U.S. Computer Serv., 974 F.2d 409, 412 (3d Cir. 1992).  "[I]f the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden."  Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991).

ERAC-New York bears the burden of proving that Hagstrom was exempt from the overtime provisions of the FLSA.  Id.  In order for summary judgment to be granted, ERAC-New York must establish all the essential elements of the exemption to the extent required by the summary judgment standard discussed above.  If a reasonable jury could find that ERAC-New York did not meet its burden with respect to just one element of the relevant exemption, it would be compelled to return a verdict in favor of Hagstrom as to that exemption.  As such, summary judgment is inappropriate here unless there are no genuine issues as to material facts with respect to any of the elements of the exemption.  Each exemption, however, is independently sufficient to provide the basis for judgment in favor of ERAC-New York.  See 29 U.S.C. § 213(a)(1) ( providing that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt (emphasis added)).  To prevail, ERAC-New York must establish a lack of

---

[9] "The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted."  Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987); see De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 373 (3d Cir. 2007); Sperling v. Hoffman-La Roche Inc., 862 F.2d 439, 446-47 (3d Cir. 1988) (relying on the FLSA's "broad remedial purpose" as a basis for a liberal construction of the statute in favor of potential plaintiffs).

genuinely disputed material facts with respect to *all* the elements of at least one of the asserted exemptions.

The Secretary of Labor has statutory authority to publish FLSA regulations to aid courts in determining the scope of exemptions and has exercised that authority.  69 Fed. Reg. 22,121 (Apr. 23, 2004).  Section 13(a)(1)  of the FLSA provides that "any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman *as such terms are defined and delimited from time to time by regulations of the Secretary*" is exempt.  29 U.S.C. § 213(a)(1) (emphasis added).  Unlike prior regulations, the currently applicable 2004 regulations were adopted after notice and comment and fall within the ambit of the Secretary's legislative rule-making authority.  69 Fed. Reg. 22,121, 22,124 (Apr. 23, 2004). These regulations are, therefore, entitled to <u>Chevron</u> deference.  <u>See</u>  <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984); <u>Cash v. Cycle Craft Co., Inc.</u>, 508 F.3d 680, 683. (1st Cir. 2007).

Under the regulations, exempt work includes any work which is "directly and closely related to the performance of exempt work."  29 C.F.R. § 541.703.  The regulations provide the following guidance:

> The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. Work "directly and closely related" to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine. Work is not "directly and closely related" if the work is remotely related or completely unrelated to exempt duties.

Id.   In a similar vein, "[o]ccasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees" are exempt when they are done as a means of performing an exempt task.  29 C.F.R. § 541.707.  The court should consider the following factors in determining whether occasional tasks are exempt: (1) "[w]hether the same work is performed by any of the exempt employee's subordinates"; (2) the "practicability of delegating the work to a nonexempt employee"; (3) "whether the exempt employee performs the task frequently or occasionally"; and (4) "existence of an industry practice for the exempt employee to perform the task." Id.

The executive, administrative and combination exemptions will be addressed in order.


### 2.  The Executive Exemption

An exempt "executive" is any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;[10]
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[10] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

29 C.F.R. § 541.100(a).

### (a)  Management as Primary Duty

The regulations provide a nonexhaustive list of "management" duties.  29 C.F.R. §

541.102.[11]  An employee may concurrently perform nonexempt duties and still qualify for the

executive exemption as long as the requirements of § 541.100 (including the primary duty

requirement) are otherwise satisfied.  Id. § 541.106.

The regulations define "primary duty" as "the principal, main, major or most important

duty that the employee performs."  29 C.F.R. § 541.700(a); see Reich v. Wyoming, 993 F.2d 739

742 (10th Cir. 1993) (providing that the employee's primary duty is that which is of principal

importance to his or her employer); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir.

1982) (finding assistant manager's primary duty to be that which is most critical or important to

success of the business).   Thus, "[d]etermination of an employee's primary duty must be based

on all the facts in a particular case, with the major emphasis on the character of the employee's

---

[11] Section 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as
> interviewing, selecting, and training of employees; setting and adjusting their
> rates of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and
> grievances; disciplining employees; planning the work; determining the
> techniques to be used; apportioning the work among the employees; determining
> the type of materials, supplies, machinery, equipment or tools to be used or
> merchandise to be bought, stocked and sold; controlling the flow and
> distribution of materials or merchandise and supplies; providing for the safety
> and security of the employees or the property; planning and controlling the
> budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

job as a whole."  29 C.F.R. § 541.700(a).  The regulations identify four nonexhaustive factors to

consider when determining an employee's primary duty, including:

> (1) "the relative importance of the exempt duties as compared with
> other types of duties;"

> (2) "the amount of time spent performing exempt work;"

> (3) "the employee's relative freedom from direct supervision; and"

> (4) "the relationship between the employee's salary and the wages
> paid to other employees for the kind of nonexempt work performed
> by the employee."

Id.  The amount of time spent in the performance of exempt work may be a useful guide in

determining whether exempt work is an employee's primary duty.  Id.  Employees who spend

more than half of their time on exempt work generally satisfy the primary duty requirement.  Id.

The regulations caution, however, against blind adherence to a time-based analysis, as time spent

on exempt work is only one of the four nonexhaustive factors to consider.  Id. [12]

Each of the four factors will be considered in order.

First, with respect to the relative importance of exempt duties, a jury could reasonably

determine that Hagstrom's limited exempt duties were much less important than his nonexempt

duties.  Among Hagstrom's exempt executive duties were his limited role training employees,

and any time he spent directing and delegating other employees in their work.  A jury could

---

[12] The regulations provide the following example of the application of the primary duty analysis:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as
> supervising and directing the work of other employees, ordering merchandise, managing the
> budget and authorizing payment of bills may have management as their primary duty even if the
> assistant managers spend more than 50 percent of the time performing nonexempt work such as
> running the cash register. However, if such assistant managers are closely supervised and earn
> little more than the nonexempt employees, the assistant managers generally would not satisfy the
> primary duty requirement.

29 C.F.R. § 541.700(c).

reasonably conclude, based upon Hagstrom's testimony, that these obligations were not nearly as important to ERAC-New York as Hagstrom's responsibilities in performing labor-intensive or sales-related functions at the branch.  Those labor-intensive or inside-sales tasks (which are nonexempt) were vital to the success of his branch, whereas Hagstrom's testimony establishes that his role as a delegator of tasks or as a trainer were not as important—many of the employees were self-sufficient and capable of doing their jobs without any meaningful oversight, and many employees simply ignored Hagstrom.  His testimony also shows that he referred matters to his superiors at ERAC-New York when they were important issues, or if there was some disagreement.   It is reasonable to conclude that Hagstrom's most important purpose was to complete the menial and sales tasks necessary to rent cars to customers, without incurring overtime expenses to the branch.  This conclusion is bolstered by the substantial evidence in the record that Hagstrom's managerial roles were very limited, and involved mostly unimportant decisions, such as when an employee could take a lunch break.  The first factor weighs against the conclusion that Hagstrom's primary duty was management.

Second, regarding the amount of time spent on exempt work, reasonable inferences from Hagstrom's testimony lead to the conclusion that he spent the majority of his time on nonexempt tasks such as working at the rental counter.  He testified that he spent substantial amounts of time moving and washing cars, working at the rental counter, and writing rental tickets.  ERAC-New York tried but failed to establish that he was constantly overseeing and directing employees at the same time he was performing other functions.  His testimony, however, indicates that he often worked at the counter alone, and that the Thompson branch was often understaffed, reducing the opportunity for Hagstrom to provide oversight and direction to other employees.  The second factor weighs against Hagstrom's primary duty being management.

Third, with respect to freedom from supervision, Hagstrom's testimony indicated that his superiors were usually present at the branch and he relied on supervisors whenever an important issue arose; even when his branch manager was absent, he had access to human resources personnel or his area manager.  He testified that the branch manager usually ran the counter at the branch, set the schedule, assigned tasks and resolved disputes between the employees (including disputes between Hagstrom and a nonexempt employee).  He testified that difficult decisions were referred to his superiors, his problem solving was limited to minor or easily resolvable issues, he did not develop logical strategies or strategic alternatives to solving problems, and his work was primarily dictated by pre-established policies from which he did not deviate.  Freedom from supervision includes the concept of independent discretion.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision. . . . Thus, the . . . regulations . . . are consistent with[] our consideration of the frequency with  which an employee exercises discretionary powers in our primary duty analysis.").  There is little, if any, evidence in the record showing that Hagstrom exercised discretion in matters beyond delegating minor tasks.  The third factor weighs against the conclusion that Hagstrom's primary duty was management.

Fourth, the court must consider Hagstrom's wage in relation to nonexempt employees.  Because the court was not presented with any evidence about the "wages paid to *other* employees" during the time period when Hagstrom was an assistant manager, the court will consider this factor neutral.  To the extent the court has limited information about the wages of nonexempt employees based upon Hagstrom's wage before his promotion, the factor would still be neutral.  Hagstrom's testimony indicated that assistant managers occasionally made less money than nonexempt employees if the nonexempt employees earned significant overtime and

30

the branch profitability.  In light of the lack of record evidence about how much management trainees and management assistants who worked concurrently with Hagstrom *actually* earned, and because the limited evidence available leads to no meaningful comparison, the court cannot discern that this factor would weigh either for or against a conclusion that management was Hagstrom's primary duty.  The court will, therefore, consider it a neutral factor.

Because the court concludes that, when viewing the facts in the light most favorable to Hagstrom, three of the four primary duty factors collectively could be found in his favor and the other factor is neutral, it is for a jury to determine whether his primary duty was management.  A reasonable jury could conclude that Hagstrom's nonexempt tasks—like writing rental tickets, cleaning cars, and moving cars—were his duties of principal importance to ERAC-New York, see Reich v. Wyoming 993 F.2d 739, 742 (10th Cir. 1993), and were most critical or important to the success of ERAC-New York, see Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982).   A jury could reasonably conclude that his most critical or important purpose to ERAC-New York was to perform the necessary menial functions remaining after the nonexempt management trainees, management assistants and car preps had gone home for the day (or if they failed to appear).   This conclusion is supported by Hagstrom's testimony that his job functions were essentially unchanged by his promotion to assistant manager and the court's conclusion that those managerial tasks he *did* perform were largely unimportant, noncritical functions, many of which were shared with nonexempt employees.

*(b) Customarily and Regularly Directs Work of Two or More Employees*

To qualify under the executive exemption, an employee must customarily and regularly direct the work of two or more other employees, or their equivalent.  29 C.F.R. §§ 541.100(a)(3), 541.104(a).  According to the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701.   "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement."  Id. § 541.104(c).

ERAC-New York did not meet its burden to demonstrate that, as a matter of law, Hagstrom customarily and regularly directed the work of two or more full time employees.  "An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence, does not meet this requirement."  Id.  Accepting as true Hagstrom's deposition testimony, Hagstrom's branch manager was responsible for directing and supervising the ERAC-New York employees, managing them, assigning most tasks and setting the work schedule.   In determining this element, although supervisory responsibility may be distributed among multiple executives, hours worked by a subordinate employee cannot be credited to more than one executive.  29 C.F.R. § 541.104(d) ("Hours worked by an employee cannot be credited more than once for different executives.  Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement.").  The record indicates there were many times during which there were fewer than two nonexempt employees working at the Thompson branch.  There is insufficient evidence in

32

the record to conclude that there were sufficient collective hours worked by the three or fewer subordinate employees (including Hagstrom) during those periods to satisfy this element of the executive exemption with respect to a branch manager *and* to Hagstrom.  ERAC-New York failed to introduce sufficient evidence about the staffing of the ERAC-New York branch during the three-week period in which there was no branch manager for the court to determine that this element was met during that period.

A reasonable jury could also conclude that Hagstrom only supervised other employees in the branch when the branch manager was not present, based on the testimony that the branch manager oversaw all but the most mundane decisions, and that Hagstrom relied on his superiors to make important decisions.  Accepting Hagstrom's testimony as true, this conclusion is not altered during the short period of time where there was no branch manager.  Hagstrom testified that his responsibilities for the branch did not change during that time period and that supervisory responsibilities were taken over by Crivaro, the area manager.

The court concludes that ERAC-New York failed to meet its burden to satisfy this factor of the executive exemption because a reasonable jury could conclude that (1) Hagstrom did not, at times, supervise two or more full-time employees on a customary and regular basis, and (2) Hagstrom "merely assist[ed] the manager … and supervise[d] . . . only in the actual manager's absence" even if there were sufficient employees working at ERAC-New York.  29 C.F.R. § 541.104(c).

### (c)  Authority to Hire, Fire, or Effect Some "Other Change of Status"

In order to qualify as an exempt executive, an employee must have authority to hire or fire other employees, or have particular weight given to his or her suggestions and

recommendations regarding hiring, firing, promotion, advancement or other changes of status. 29 C.F.R. § 541.100(a)(4).  "[O]ther change of status" means any "tangible employment action" as that term is commonly used under Title VII, such as "reassignment with significantly different responsibilities."  69 Fed. Reg. 22,122, 22,131 (Apr. 23, 2004).  In the Title VII context, the Supreme Court has defined "tangible employment action [to] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Pa. State Police v. Suders, 542 U.S. 129, 144 (2004).  "A tangible employment action in most cases inflicts direct economic harm."  Burlington Indus., 524 U.S. at 762.

To determine whether an employee's suggestions and recommendations are given "particular weight," it is not required that the employee have final authority regarding any of the above-listed changes in employment status.  29 C.F.R. § 541.105.  Instead, courts should consider whether making suggestions is part of the employee's job description or duties, whether suggestions are made or requested frequently, and whether they are frequently relied upon.  Id.; see Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (finding crew leaders of chicken catchers to be nonexempt when they could not hire or fire employees, but had limited authority to borrow workers from other crews, and made referrals to their employer regarding prospective employees).

There are genuine issues of fact with respect to this element of ERAC-New York's affirmative defense which preclude summary judgment.  Hagstrom testified he was not responsible for the hiring, firing, advancement, promotion or other changes in the status of branch employees.  The record shows that Hagstrom neither meaningfully participated in nor

made material suggestions with respect to hiring, firing, advancement, promotion or other material changes of status.  He testified he did not discipline employees, except in a few situations where he merely documented what happened, and was not involved in any decision making about whether to take disciplinary action.

With respect to particular weight, the court must consider whether suggesting employment actions is part of the employee's job description or duties, whether suggestions are frequently made or requested, and whether they are frequently relied upon.  29 C.F.R. § 541.105; Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006).  There are genuine disputes with respect to this component.  Although testimony of ERAC-New York employees indicates that Hagstrom was expected to participate and did participate in these types of decisions, his own testimony indicates that he did not have sufficient involvement.  In resolving the dispute, the court must credit the testimony Hagstrom.  Because he testified that he had no involvement in hiring, firing, promotional, reassignment and termination decisions, a reasonable jury could conclude he did not make recommendations which were given particular weight.

ERAC-New York's attempt to argue that Hagstrom's reporting or making a record of disciplinary situations is sufficient to meet this element is unavailing.  The record reflects that he did little more in those situations than write down what had happened.  All employees have some degree of responsibility to report disciplinary or troubling information to their employer about co-workers.  Creating a record or reporting an issue does not reach the level necessary to meet the requirements of this element of the executive exemption.  Similarly, Hagstrom's informal conversations with Crivaro about employees are insufficient proof of the "particular weight" requirement, because a reasonable jury could conclude his involvement in the actual hiring, firing, and advancement process was so minimal that it is apparent he was not actually involved

in making the decision in a meaningful way.  See Davis v. Mountaire Farms, Inc., 453 F.3d at 558 (holding that making referrals was not substantial enough involvement).  Crivaro most likely relied on Hagstrom as a source of information, but that does not mean Hagstrom actually made *suggestions* about personnel decisions, which were given any weight, because those conversations, according to Hagstrom, were never carried out in the context of whether Crivaro *should* hire, fire, promote or reassign an employee.

Because there are material facts in dispute with respect to three of the four elements of the executive exemption, ERAC-New York failed to meet its burden and summary judgment cannot be granted on the basis of the executive exemption.

### 3.  The Administrative Exemption

An exempt "administrative" employee is any employee:

(1) Compensated on a salary or fee basis at a rate not less than $455 per week[13] . . . ;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

### (a)  Primary Duty of Management or Business Related Office Work

---

[13] The parties do not dispute that plaintiffs satisfied the "salary basis" requirement of the executive and administrative exemptions. This memorandum opinion, therefore, will not discuss that element of the exemptions.

Under the administrative exemption, an employee's "primary duty"[14] must consist of performing office or nonmanual work directly related to the management and general business operations of the employer.  29 C.F.R. § 541.200(a)(2).  Section 541.201(b) provides examples of "[w]ork directly related to management or general business operations":

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

In order for work to be "directly related to the management or general business operations," it must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id. § 541.201(a).  The concept of a "production worker" is not limited to individuals involved in the manufacture of tangibles.  Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991).  For example, in Martin v. Cooper, the Court of Appeals for the Third Circuit held inside[15] salespersons of electrical products to be production, rather than administrative, employees.  Id. at 903.

The administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they

---

[14] See supra, Section IV.C.2.a, for a discussion of the term "primary duty."
[15] An "inside" salesperson is an employee who makes sales inside his or her place of business, which contrasts with the outside salesperson, exempt under the FLSA, who must be "customarily and regularly engaged away from the employer's place of business."  29 C.F.R. § 541.500.

contribute to the running of the business itself.  Bothell v. Phase Metrics, Inc., 299 F.3d 1120,

1127 (9th Cir. 2002).  Thus, context matters: an underwriter at a department store who decides

whether to issue credit to consumers "performs a support function auxiliary to the department

store's primary function of selling clothes"; whereas, an underwriter for a large bank "is directly

engaged in creating the 'goods'—loans and other financial services—produced and sold by [the

bank]."  Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009).  Courts

distinguish exempt administrative employees from nonexempt production employees who

perform administrative tasks by determining whether the employees are engaged in the "running

of the business and not merely . . . the day-to-day carrying out of its affairs."  Bratt v. Cnty. of

Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990).

      ERAC-New York argues that Hagstrom was involved in many of the activities expressly

identified in § 541.201(b), including finance, marketing, safety and health, personnel

management and human resources.  (Mem. Supp. Def. ELRAC's Mot. Summ. J. as to Pl. Nils

Hagstrom ("ERAC-New York Br.") (ECF No. 250) at 25-27.)  ERAC-New York also argues that

his fleet management responsibilities were administrative without specifically identifying which

of the § 541.201(b) categories that work would fall under.  (Id.)  Hagstrom argues that his office

responsibilities were not sufficiently important to ERAC-New York and were merely the

carrying out of its daily affairs.

      To the extent ERAC-New York points to specific administrative job duties performed by

Hagstrom, many of those duties were nonexempt.  For example, ERAC-New York argues that

Hagstrom's marketing and sales calls to customers and prospective customers were

administrative tasks relating to marketing.  For a variety of reasons, the court is not persuaded

that such actions, even if they were Hagstrom's primary duty, would qualify as administrative

under the regulations.  Making sales calls and salesmanship (which are distinct from marketing) are not listed as examples of exempt areas of work in § 541.201(b).  Inside sales are production tasks, and the regulations provide a separate exemption for outside sales employees, which ERAC-New York did not raise as a distinct defense in this motion for summary judgment (but only as a component of the combination exemption).

With respect to ERAC-New York's argument that Hagstrom's responsibilities in fleet management constituted administrative work, the tasks ERAC-New York points to are not administrative because they do not amount to the running of the business; they are, rather, merely the carrying out of its day-to-day affairs.  Hagstrom's testimony established that his role in fleet management was minor, and was coextensive with the role played by nonexempt employees.  Hagstrom's fleet management responsibilities amounted to participation in the production of ERAC-New York's marketplace offering—rental cars—as opposed to performance of an auxiliary task directly related to the management of the business.  See 29 C.F.R. § 541.201(a); Davis, 587 F.3d at 535; Bothell, 299 F.3d at 1127; Bratt, 912 F.2d at 1070.

With respect to other tasks which ERAC-New York argues were administrative, there are genuine disputes about whether Hagstrom performed those duties, the frequency of performance, and what the performance actually entailed.  These disputes include Hagstrom's responsibilities in human resources and personnel management.  As discussed above with respect to the executive exemption, the court must accept Hagstrom's testimony that his role in those tasks was incredibly limited, and that he generally did not participate in a meaningful way in running the ERAC-New York branches with respect to those aspects of the business.

More importantly, there is insufficient evidence to determine as a matter of law that the arguably administrative tasks performed by Hagstrom constituted his "primary duty."  It is not

the province of this court on a motion for summary judgment to weigh the evidence in the record.  The court cannot ignore the reasonable inference that Hagstrom spent the majority of his time on sales and manual labor, and the court cannot disregard the testimony of Hagstrom that his primary responsibility in terms of importance to ERAC-New York was sales-related or involved physical labor.  Inside sales tasks and physical tasks are not within the ambit of the administrative exemption. Martin v. Cooper, 940 F.2d at 903-06.  Inside salespeople may be production employees.  Id.  ERAC-New York did not meet its burden of proving that Hagstrom's primary duty was management– or business-related office or nonmanual work.

### (b)  Discretion and Independent Judgment and Matters of Significance

To fall within the administrative exemption, an employee must "exercise . . . discretion and independent judgment with respect to matters of significance" as part of his or her primary duty.  29 C.F.R. § 541.200(a)(3).  The regulations consider the exercise of discretion and independent judgment to involve evaluation of options and subsequent decisionmaking.  Id. § 541.202(a).  Courts should determine whether an employee exercises discretion and independent judgment "in . . . light of all the facts involved in the particular employment situation in which the question arises." Id. § 541.202(b).  When determining whether an employee exercises discretion and independent judgment with respect to matters of significance, courts should consider the following nonexhaustive list of factors:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to

> commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

The FLSA "discretion and independent judgment" requirement can be satisfied even if the employee's decisions are reviewed or changed by a superior. "[T]he term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review," but the employee's decisions "may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). For that reason, "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." Id. Employees can exercise discretion and independent judgment even when their recommendations are subject to review. Id.; accord Paul v. UPMC Health Sys., No. 09-1565, 2009 WL 699943, at *12 (W.D. Pa. Mar. 10, 2009). Carrying out clerical duties, on the other hand, is not sufficient for administrative exemption, even if the duties involve a small amount of discretion. See Goldstein v. Dabanian, 291 F.2d 208, 210-11 (3d Cir. 1961) (holding that employees, whose duties included cashing checks, accepting payments and issuing money orders, were not within the administrative exemption).

41

Here, ERAC-New York did not specifically address the factors enumerated in 29 C.F.R. § 541.202(b).  ERAC-New York instead argued generally that when Hagstrom participated in fleet management, resolved customer complaints, documented disciplinary incidents and determined which customers could rent cars, he was required to exercise independent judgment and discretion.  (ERAC-New York Br. (ECF No. 246) at 26-28.)  There are genuine disputes about whether Hagstrom actually carried out several of these duties in a meaningful way.  For example, he testified that he did not have much responsibility for fleet management.  None of these tasks reach the level of importance or consequence contemplated by the regulations as necessary to qualify an employee for the administrative exemption.  Section 541.202(b) gives examples of the kinds of questions a court should consider in this analysis, and suggests that the term "matters of significance" is a context-specific determination which "must be applied in the light of all the facts involved in the particular employment situation."  29 C.F.R. § 541.202(b).  It refers to "major assignments," "matters that have significant financial impact," and establishing policies and objectives for the company.  Id.  Hagstrom was bound by company policy in almost all matters beyond the most mundane, and did not deviate from policy.  He was usually subject to the oversight of supervisors.  The record reflects that Hagstrom deferred to superiors when he was presented with a difficult situation.  To the extent that he made discretionary decisions in sales or in delegating minor tasks to employees, those decisions were not significant enough, in the context of a car rental business, to meet the requirements of the regulations.  Minor deviations in rates for specific types of cars, and decisions about which cars to keep on which lots—the full extent of his independent discretion—are among the most mundane, least significant types of decisions made by employees at a car rental company.  Merely because he could damage the business if he made a mistake or acted recklessly in his duties does not

establish that he has the requisite discretion to meet the administrative exemption.  29 C.F.R. § 541.202(f) ("An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.").

Resolving factual disputes in favor of Hagstrom's testimony, the court finds that a reasonable jury could conclude that none of the enumerated factors listed in 29 C.F.R. § 541.200(a)(3) were proven. There are material facts in genuine dispute regarding both Hagstrom's independence and his discretion.

For the reasons stated above, the court finds that there are genuine disputes with respect to material facts in two of the three § 541.200(a) elements of the administrative exemption. Because ERAC-New York has the burden of proving each element of the exemption, these genuine disputes preclude summary judgment on the basis of the administrative exemption.

### 4.  The Combination Exemption

Under the FLSA regulations, an employee who performs a combination of exempt duties—but who does not satisfy the primary duty requirement under any of the stand-alone exemptions—may nonetheless qualify for exempt status. 29 C.F.R. § 541.708.  "[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption" so long as the other requirements, such as the salary basis test, are met.  Id.; accord IntraComm, Inc. v. Baja, 492 F.3d 285, 292-95 (4th Cir. 2007) (deferring to the Secretary of Labor's interpretation that "the combination exemption provides a mechanism for cobbling together different exempt duties for the purposes of meeting the primary-duty test" but "does not . . . relieve employers of their burden to independently establish the other

43

requirements of each exemption whose duties are combined"). The primary thrust of the combination exemption, therefore, is merely that the performance of exempt executive work cannot be the basis for preventing an otherwise exempt administrative employee from being exempted because his primary duty is blended between executive and administrative work and vice versa. Id.

The court's determination that a reasonable jury could conclude nonexempt tasks involving sales and manual labor constituted Hagstrom's primary duty preclude summary judgment on the basis of the combination exemption.

Conclusively, because ERAC-New York did not meet its burden with respect to other necessary elements of both the administrative and the executive exemptions—beyond merely failing to establish the primary duty element—the combination exemption is inapplicable to Hagstrom. See IntraComm, Inc. 492 F.3d at 292-95. Thus, the court cannot grant ERAC-New York's motion for summary judgment on the basis of the combination exemption, even if his primary duty were found to be some combination of exempt administrative and executive tasks.[16]

## VI. Conclusion

For the reasons set forth in this memorandum opinion, because ERAC-New York did not prove as a matter of law *all* the elements of at least one of the exemptions, and in consideration

---

[16] ERAC-New York argues that the court should consider the time Hagstrom spent marketing outside the branch as part of the combination exemption analysis, under the theory that it should be classified as exempt under the outside sales exemption, which was not raised as an independent defense. Because, as explained above, ERAC-New York failed to meet its burden with respect to necessary elements of both exemptions it did raise as independent defenses, the court need not consider the impact of the time spent on outside sales calls. Even if Hagstrom's primary duty was a combination of executive, administrative and outside sales tasks, ERAC-New York needed to prove all other necessary elements of those exemptions—which it failed to do—in order to meet the requirements of the combination exemption.

of the relevant summary judgment standard and the narrowly construed FLSA exemptions,

ERAC-New York's motion for summary judgment against sample plaintiff Nils Hagstrom (ECF

No. 249) will be denied.  Summary judgment is precluded by the abundance of disputed material

facts regarding Hagstrom's job responsibilities, on which the court must defer to future

resolution by a jury.[17]  An order will follow.

By the court,

  /s/ Joy Flowers Conti
Hon. Joy Flowers Conti
United States District Judge

Date:    September 13, 2012

---

[17] ERAC-New York also raised analogous exemption defenses to Hagstrom's state law overtime claims in its
motion, but did not independently address the state law issues.  Instead, ERAC-New York noted in a footnote that
the state exemptions are the same as the federal exemptions.  (ERAC-New York Br. (ECF No. 250) at 25 n.5.)
Based on that concession, the court will deny the motion for summary judgment with respect to ERAC-New York's
state law defenses, in addition to the FLSA defenses, for the same reasons it denied the motion with respect to the
FLSA defenses, which are set forth in this memorandum opinion.